IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JESSE CAMPBELL, | ) | CASE NO. 1:12CV1406 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY,[1] | ) | |
| | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff Jesse Campbell ("Plaintiff" or "Campbell") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act), 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.* Doc. 1. This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 13. For the following reasons, the final decision of the Commissioner is **AFFIRMED.**

## I. Procedural History

Campbell filed an application for DIB on October 16, 2009, and an application for SSI on November 10, 2009, alleging a disability onset date of October 13, 2009. Tr. 133-44. He claimed that he was disabled due to attention deficit hyperactivity disorder ("ADHD"), anxiety, depression, paranoid schizophrenia, and obsessive compulsive disorder ("OCD"). Tr. 77-97. Campbell's applications were denied initially and on reconsideration. Tr. 77-97. At Campbell's request, on February 8, 2011, a hearing was held before Administrative Law Judge O. Price Dodson (the "ALJ"). Tr. 22-47. On February 23, 2011, the ALJ issued a decision finding that

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is hereby substituted for Michael J. Astrue as the Defendant in this case.

Campbell was not disabled. Tr. 6-21. Campbell requested review of the ALJ's decision by the Appeals Council on March 10, 2011. Tr. 4. On April 18, 2012, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.[2] Tr. 1-3.

## II. Evidence

### A. Background

Campbell was born on June 6, 1982, and was 27 years old at the time of the alleged onset date. Tr. 16. He graduated from high school (Tr. 27) and has past relevant work experience as a truck loader and dishwasher. Tr. 55. At the time of the administrative hearing, Campbell lived with his mother and father. Tr. 26.

### B. Medical Evidence [3]

From November 2009 through December 2010, Campbell saw Sheetal Joshi, M.D., at the Community Counseling Center of Ashtabula County for mental health treatment. Tr. 265-281, 300-306, 338-344. On October 20, 2009, Campbell presented for treatment with complaints of paranoid schizophrenia. Tr. 269. He stated that he had a history of alcohol use but that he had been sober for three years. Tr. 269. He also explained that, in 2005, he began having auditory and visual hallucinations with paranoia. Tr. 269. At an appointment on November 24, 2009, Campbell further explained that, while he continued to suffer from paranoia, he had not had any auditory or visual hallucinations in three years. Tr. 267-68. Dr. Joshi diagnosed schizophrenia, paranoid type, rule-out schizoaffective disorder, and assigned a Global Assessment of

---

[2] Before the decision involved in this case, Campbell had received two partially favorable decisions from which he did not appeal. Tr. 9. On August 12, 2009, he was awarded disability benefits for the period from February 24, 2007, through November 5, 2008. Tr. 48-63. Campbell also was awarded a second closed period of disability from May 14, 2004, through February 23, 2007. Tr. 9.

[3] Campbell's brief focuses primarily on his mental health impairments. Therefore, this Opinion shall also focus on Campbell's medical history as it relates to his mental health impairments.

Functioning score of 50.[4] Tr. 268.

Campbell saw Dr. Joshi on January 20, 2010, and reported that everything was "going well." Tr. 305. He affirmed that he was compliant with medications and had not had any hallucinations. Tr. 305. He also stated that he had volunteered to dress up as Santa Claus for a charity event and that he enjoyed the event. Tr. 305. He also reported that he was seeking a part-time job so he could keep himself busy. Tr. 305. Upon examination, Campbell was alert, had "good" mood, his affect was euthymic, his speech was clear, his thought process was linear, he had normal insight and judgment, and he denied any suicidal or homicidal thoughts or ideations. Tr. 305. Dr. Joshi revised his diagnosis and found that Campbell's schizophrenia was in remission. Tr. 305.

At a follow-up appointment on February 1, 2010 with Dr. Joshi, Campbell reported that he had twitching near his lips and was worried it was a side effect of medications. Tr. 304. Dr. Joshi ruled out that possibility because Campbell had been on the same medication for several years. Tr. 304. A mental status examination was unremarkable. Tr. 304. Again, Dr. Joshi found that Campbell's schizophrenia was in remission. Tr. 304. At an appointment on February 19, 2010, Campbell reported that overall things had been going well and that his mood was much better. Tr. 303. Dr. Joshi noted that Campbell denied any significant symptoms of depression or anxiety at that point. Tr. 303. Again, a mental status examination was unremarkable. Tr. 303.

On March 19, 2010, Campbell reported to Dr. Joshi that he was "slightly stressed out" because he learned that his father had a lesion on his kidney. Tr. 301. He also reported that he had been having some trouble concentrating and wanted to obtain a trial of Adderall. Tr. 301.

---

[4] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

Dr. Joshi did not prescribe Adderall. Tr. 301.

At a follow-up appointment on August 2, 2010, Campbell reported that he had been doing well. Tr. 342. He denied any difficulties with anxiety or worrying or panic attacks. Tr. 342. A mental status examination was unremarkable. Tr. 342. On September 3, 2010, Campbell reported that he had quit smoking cigarettes and had experienced weight gain as a result. Tr. 341. He stated that he was thinking of undergoing gastric bypass surgery. Tr. 341. He also reported that he went camping during the summer and had no psychosis. Tr. 341. Dr. Joshi reaffirmed his prior diagnosis of schizophrenia, paranoid type, in remission, and assigned Campbell a new GAF score of 60.[5] Tr. 341. Campbell saw Dr. Joshi on October 1, 2010, and reported that he continued to take his medications and that the medications "have really helped him with his mood as well as his attitude." Tr. 340. Dr. Joshi continued Campbell's medications. Tr. 340.

On December 2, 2010, Dr. Joshi completed a form captioned "Medical Source Statement: Patient's Mental Capacity."[6] Tr. 322. He opined that Campbell had poor ability in the following areas: maintaining attention and concentration for extended periods of two hour segments and dealing with work stresses. Tr. 322. Dr. Joshi also opined that Campbell had fair ability in the following areas: using judgment, to respond appropriately to changes in routine settings and dealing with the public. Tr. 322. He further opined that Campbell had good ability in the following areas: following work rules, relating to co-workers, interacting with supervisors, functioning independently without special supervision, and working in coordination with or

---

[5] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

[6] The medical source statement that is contained in the record is only one page long, is unsigned and undated. Even though the medical source statement is undated and unsigned, Plaintiff and the Commissioner both agree that the source of the document is Dr. Joshi. Doc. 15, pp. 7-10; Doc. 16, pp. 7-8. Although unclear, it appears that the statement was originally more than one page in length and that the rest of the statement was either not completed by Dr. Joshi or not submitted as part of the record.

proximity to others without being unduly distracted or distracting. Tr. 322.

On April 14, 2008, state agency psychiatrist Kristen Haskins, Psy.D., reviewed the record and completed a Mental RFC Assessment and a Psychiatric Review Technique Form ("PRTF"). Tr. 282-99. Dr. Haskins opined that Campbell had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Tr. 296. Further, she stated that she saw no change in Campbell's condition since the prior ALJ decision, dated August 12, 2009, and adopted that opinion under Acquiescence Ruling ("AR") 98-4.[7] Tr. 284.

C.   **Administrative Hearing**

   1.   **Campbell's Testimony**

On February 8, 2011, Campbell appeared with counsel and testified at the administrative hearing before the ALJ. Tr. 53-97. Campbell testified that he is unable to do work at a fast pace and that, when he attempted to work at a fast pace, he experienced increased paranoia. Tr. 32. He stated that his medications helped relieve his symptoms somewhat and that he still gets paranoid and has anxiety and panic attack but does not hallucinate any more. Tr. 33. Campbell stated that his panic attacks are caused by stress and described his panic attacks as tightness of the chest, difficulty breathing, and dizziness. Tr. 33. He also testified that he has difficulty with math and reading. Tr. 34. With regard to his depression, Campbell explained that he will "get down on [himself]." Tr. 34. He testified that he was demoted by Walmart from unloading trucks to the position of cart pusher because he could not keep up with the pace of unloading the trucks and that he was also demoted by Flying J Truck Stop from full time to part time work as a

---

[7] AR 98-4 states that "when adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding."

dishwasher due to his inability to keep up with the pace. Tr. 32, 35-37. He stated that he ultimately quit his job at Walmart, as well the job at Flying J, because of his inability to keep up with work demands. Tr. 29, 37.

With regard to his daily activities, Campbell testified that he had a valid driver's license but that his driving is limited. Tr. 28. He stated that he helps clean the house, that he mows the lawn, and that he does limited cooking. Tr. 30. However, he does not do laundry. Tr. 30. Campbell also explained that he watches television and goes on the computer. Tr. 31. Socially, Campbell testified that he is not in a relationship and very rarely goes out with his friends. Tr. 38, 41. He stated that, when he does socialize with friends, he goes to venues such as the movies and the mall. Tr. 38.

### 2. Vocational Expert's Testimony

Edith J. Edwards (the "VE") appeared at the hearing and testified as a vocational expert. Tr. 44-47. She stated that Campbell had previously worked as a truck loader (unskilled position at the heavy exertional level) and dishwasher (unskilled position at the medium exertional level). Tr. 45. The ALJ asked the VE whether a hypothetical individual with Campbell's vocational characteristics and the following limitations could perform any work: "the individual is limited to medium exertion . . . with additional limitations that he would [be] restricted to simple, repetitive tasks, [and] would need to work in an environment that would not require close interaction with the general public." Tr. 45. The VE testified that the hypothetical individual could perform jobs that existed in significant numbers in the national economy, including janitor/industrial cleaner (750,000 jobs nationally and 28,125 jobs in Ohio); kitchen helper (628,000 jobs nationally and 23,550 jobs in Ohio); cleaner/housekeeper (375,000 jobs nationally and 14,060 jobs in Ohio); and laundry worker (300,000 jobs nationally and 11,250 jobs in Ohio).

Tr. 45. In a second hypothetical, the ALJ added the limitation that the individual would be unable to sustain a routine pace as would normally be required in such occupations. Tr. 46. The VE responded that, with the additional limitation, there would be no work the individual could perform. Tr. 46.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2). In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant

>work, he is not disabled.
>
>5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

At Step One of the sequential analysis, the ALJ determined that Campbell had not engaged in substantial gainful activity since October 13, 2009, the alleged onset date. Tr. 11. At Step Two, he found that Campbell had the following severe impairments: schizophrenia, obesity, and a learning disorder. Tr. 11-12. At Step Three, the ALJ found that Campbell did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[8] Tr. 12-13. The ALJ then determined Campbell's RFC, finding that he could perform medium work with the limitation that he "can perform only simple, routine, repetitive, one and two step tasks, and work that does not require close interaction with the general public." Tr. 13-16. At Step Four, the ALJ found that Campbell could not perform his past relevant work. Tr. 16. At Step Five, after considering his vocational factors, RFC, and the evidence from the VE, the ALJ found that Campbell was

---

[8] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

8

capable of performing other jobs that existed in significant numbers in the national economy, such as janitor/industrial cleaner, kitchen helper, cleaner/housekeeper, and laundry worker.  Tr. 16-17.  The ALJ thus concluded that Campbell was not disabled.  Tr. 17.

### V.  Arguments of the Parties

Campbell objects to the ALJ's decision on two grounds.  First, he argues that the ALJ erred by failing to re-contact his treating physician, Dr. Joshi, regarding his medical source statement.  Second, Campbell argues that the ALJ's failed to adequately account for Campbell's moderate limitations in social functioning in his hypothetical to the VE.

In response, the Commissioner argues that the ALJ properly evaluated Dr. Joshi's medical source statement.  In particular, the Commissioner contends that the ALJ did not have an affirmative duty to re-contact Dr. Joshi and that the ALJ did not commit any error by failing to otherwise order a consultative examination.  The Commissioner also argues that substantial evidence supports the ALJ's determination at Step Five of the sequential analysis.

### VI.  Law & Analysis

**A.**     **Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir.

2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### B. The ALJ Properly Evaluated the Opinion of Dr. Joshi

#### 1. Treating Physician Rule

Campbell asserts that the ALJ erroneously evaluated the opinion of Dr. Joshi under the treating physician rule. Reviewing the record as a whole, the undersigned finds that the ALJ properly evaluated Dr. Joshi's opinion in accordance with the treating physician rule.

Under the treating physician rule, the opinion of a treating source is entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

If an ALJ assigns less than controlling weight to a treating source's opinion, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  However, the ALJ is not obliged to set forth a detailed analysis with respect to each and every one of the factors listed above.  *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x. 802, 804 (6th Cir. 2011); *Allen v. Commissioner of Social Security*, 561 F.3d 646, 651 (6th Cir. 2009) (even a "brief" ALJ statement identifying such factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion).

As discussed above, Dr. Joshi completed a medical source statement for Campbell and opined that he had poor ability in the following areas:  maintaining attention and concentration for extended periods of two hour segments and dealing with work stresses.  Tr. 322.  Dr. Joshi also opined that Campbell had fair ability in the following areas: using judgment, responding appropriately to changes in routine settings, and dealing with the public.  Tr. 322.  He further opined that Campbell had good ability in the following areas: following work rules, relating to co-workers, interacting with supervisors, functioning independently without special supervision, and working in coordination with or proximity to others without being unduly distracted or distracting.  Tr. 322.

The ALJ evaluated Dr. Joshi's opinion, as well as the record as a whole, and reasonably assigned no weight to Dr. Joshi's medical source statement.  The ALJ explained that he gave no weight to Dr. Joshi's opinion because it was cursory and lacked any supporting documentation, signature or date.  He also found that the statement was not well supported by contemporaneous treatment notes from Dr. Joshi himself and from the Community Counseling Center.  Tr. 15. These notes consistently showed improvement in Campbell's symptoms with medication during

the relevant period. Tr. 15. The ALJ's analysis thus provided good reasons for assigning less than controlling weight to Dr. Joshi's opinion and fulfilled the ALJ's obligations under the regulations. *See, e.g., Allen*, 561 F.3d at 651 (finding that an ALJ provided good reasons for discounting treating physician opinion where the ALJ's stated reason was brief but reached several of the factors an ALJ must consider when determining what weight to give non-controlling opinion); *Bledsoe v. Barnhart*, 2006 WL 229795, at *4 (6th Cir. 2006) ("The ALJ reasoned that Dr. Lin's conclusions are 'not well supported by the overall evidence of record and are inconsistent with other medical evidence of record.' This is a specific reason for not affording controlling weight to Dr. Lin.").

A review of the record reveals that the reasons provided by the ALJ for discounting Dr. Joshi's opinion are supported by substantial evidence. For example, Dr. Joshi's treatment notes show that Campbell's symptoms improved with medication, his schizophrenia was in remission, and his GAF score improved from 50 to 60. Tr. 266-68, 301, 303-05, 338-441. In addition, although Campbell complained to Dr. Joshi of difficulty concentrating, none of Dr. Joshi's treatment records indicated he observed such a difficulty. Rather, Dr. Joshi indicated that Campbell was alert and cooperative, with a linear thought process, normal insight, normal judgment, and clear speech. Tr. 266-68, 301, 303-05, 338-441. Dr. Joshi also noted that Campbell had no symptoms of anger, no guilt, no feelings of hopelessness, no delusions, no hallucinations, no suicidal thoughts, and no suicidal ideations. Tr. 266-68, 301, 303-05, 338-441. In December 2009, Campbell told Dr. Joshi that he was in a good mood and enjoyed interacting with others while volunteering as Santa Claus. Tr. 305. And, in October 2010, Campbell reported that his symptoms had improved with medication; he stated that his

medications "really helped him with his mood as well as his attitude." Tr. 340. This evidence is inconsistent with the severe limitations found by Dr. Joshi in his medical source statement.

Further, Dr. Haskins, the state agency reviewing physician, concluded that Campbell's mental impairments did not rise to a disabling level. Agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues. *See* 20 C.F.R. § 416.927. Dr. Haskins opined that Campbell had only mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Tr. 296. This evidence supports the ALJ's determination.

Finally, Campbell was able to perform a wide range of daily activities. Campbell testified that he cleans the house, mows the law, and cooks. Tr. 30. He also stated that he socializes with friends in public venues such as the movies and the mall, attends Alcoholics Anonymous meetings, and socializes with his family. Tr. 38. Campbell reported to Dr. Joshi that he enjoyed interacting with others by playing Santa Claus at a charity event. Tr. 305. The ability to engage in these activities contradicts the severe mental limitations found by Dr. Joshi.

All of this evidence supports the ALJ's determination that Campbell could perform simple, unskilled work with only superficial social interaction. Campbell, however, cites to other evidence in the record and argues that it shows that his impairments were more severe than found by the ALJ. Doc. 15, p. 8. Even if there is evidence to support Campbell's position, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id*. at 773 (citations

13

omitted).  In this case, the ALJ reviewed the entire record, weighed the evidence, and concluded that Campbell retained the ability to perform medium work except that he could perform only "simple, routine, repetitive, one and two step tasks, and work that does not require close interaction with the general public."  Tr. 13.  Even assuming there is evidence in the record that supports Campbell's claim that he was more limited than found by the ALJ, substantial evidence also supports the ALJ's conclusion.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ," the Commissioner's decision cannot be overturned).  Based on the applicable standard of review set forth above, the ALJ's decision is therefore affirmed.

> **2.     Duty to Re-Contact Dr. Joshi/Order a Consultative Psychological Examination**

Campbell also argues that the ALJ should have re-contacted Dr. Joshi for clarification of his opinion and/or to obtain additional medical records before rejecting that opinion in his RFC analysis.  This argument is meritless.

An ALJ has a duty to develop the record because of the non-adversarial nature of Social Security benefits proceedings. *See Heckler v. Campbell,* 461 U.S. 458, 470, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). The duty to develop the record, however, is balanced with the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 391 (6th Cir. 1999) (explaining claimant's burden to prove disability).

An ALJ has a duty to re-contact a treating physician if the evidence from the treating physician is inadequate to determine whether the claimant is disabled. *Poe v. Commissioner*, 342 F. App'x 149, 156 n. 3 (6th Cir. 2009). As explained by the Sixth Circuit, "an ALJ is required to re-contact a treating physician only when the information received is inadequate to reach a determination on claimant's disability status, not where, as here, the ALJ rejects the limitations recommended by that physician." *Ferguson v. Commissioner*, 628 F.3d 269, 274 (6th Cir. 2010) (quoting *Poe v. Commissioner*, 342 F. App'x 149, 156 n. 3 (6th Cir. 2009)). Where the duty is not triggered, it is not violated. *Id.*

Here, Dr. Joshi's report was sufficient for the ALJ to make a determination as to Campbell's disability. Indeed, the ALJ did not reject Dr. Joshi's opinions because they were unclear to him. Rather, the ALJ rejected Dr. Joshi's opinions because they were inconsistent with his own treatment notes and other evidence in the record. The ALJ specifically found that Dr. Joshi's opinion was "not well supported by [Campbell's] lengthy treatment history at Community Counseling Center that consistently showed improvement in his symptoms with medication." Tr. 15. The ALJ did not find the evidence in this case lacking or unclear, but simply unpersuasive. Thus, as in *Ferguson*, the ALJ rejected the treating physician's opinion not because the basis for the opinion was unclear but because the basis was not supported by objective medical evidence. *Id.* Accordingly, the ALJ did not have an affirmative duty to re-contact Dr. Joshi.

Further, it should be noted that Campbell was represented by counsel before the ALJ in this case. At the hearing, counsel did not indicate or suggest to the ALJ that any medical records were missing from the administrative record, nor did counsel ask for the ALJ's assistance in obtaining any additional medical records. Although the ALJ has the duty to develop the record,

such a duty does not permit a claimant, through counsel, to rest on the record and later fault the ALJ for not performing a more exhaustive investigation.  *See Branum v. Barnhart,* 385 F.3d 1268, 1271-72 (10th Cir. 2004) (concluding that the ALJ satisfactorily developed the record when the claimant's "counsel did not indicate or suggest to the ALJ that any medical records were missing from the administrative record, nor did counsel ask for the ALJ's assistance in obtaining any additional medical records").  "[T]he ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present [the] claimant's case in a way that the claimant's claims are adequately explored."  *Id*.  Because Campbell's counsel did not inform the ALJ that Dr. Joshi's medical source statement was incomplete, it was within reason for the ALJ to rest on the record at the time of the hearing.  For this additional reason, the Court finds that the ALJ did not have a duty to re-contact Dr. Joshi.

Alternatively, Campbell argues that, even if the ALJ did not have a duty to re-contact Dr. Joshi, he nevertheless should have ordered a consultative psychological examination.  Doc. 15, p. 9.  Campbell argues that additional evidence of his mental functioning was necessary for the ALJ to adequately consider his application for disability.  This argument again goes to the ALJ's duty to develop the record.  An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary. *Foster v. Halter,* 279 F.3d 348, 355 (6th Cir.2001) (quoting 20 C.F.R. §§ 404.1517, 416.917) ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests."); *see also Landsaw*, 803 F.2d at 214 ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.").  The burden of

16

providing a complete record, that is, complete and detailed enough to enable the ALJ to make a disability determination, rests with the claimant and the claimant is responsible for furnishing evidence to show that he is disabled.  *Id.*  Thus, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to make the disability decision.[9]  *Id.*  ("The regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.").

In this case, the Court finds that the ALJ was not required to order a consultative psychological examination because the evidence as a whole was sufficient for the ALJ to make a disability determination.  As set forth above, there was sufficient evidence in the record for the ALJ to evaluate Campbell's mental impairments and determine the limitations imposed by those impairments.  Accordingly, the ALJ did not abuse his discretion by failing to order a consultative psychological evaluation.

### C. The ALJ Satisfied the Commissioner's Burden at Step Five of the Sequential Analysis

Finally, Campbell asserts that the ALJ did not adequately account for his moderate limitations in social functioning.  Doc. 15, pp. 10-11.  In so arguing, Campbell implies that the ALJ's hypothetical questions to the VE were erroneous.  This argument is unpersuasive.

Once it has been determined that a claimant cannot perform his past relevant work, the burden shifts to the Commissioner at Step Five to show that there are other jobs that exist in

---

[9] The regulations set forth examples of when a consultative examination may be necessary:
   (1) The additional evidence needed is not contained in the records of your medical sources;
   (2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;
   (3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources; or
   (4) There is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established.
20 C.F.R. §§ 404.1519a(b) 416.919a(b).

17

significant numbers in the economy that the claimant can perform, consistent with his or her RFC and vocational factors of age, education and work experience. *Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987). To satisfy this burden, the ALJ may rely on the testimony of a vocational expert as long as it is in response to a hypothetical that accurately reflects the claimant's physical and mental limitations. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). In formulating the hypothetical, the ALJ only needs to incorporate those limitations he accepts as credible. *See* C*asey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

The ALJ concluded at Step Three that Campbell had moderate limitations in social functioning. Tr. 13. The ALJ accounted for this limitation in his hypothetical by limiting the hypothetical individual to working in an environment that would not require close interaction with the general public. Tr. 45. In response to the hypothetical, the VE testified that such an individual could perform work as a janitor/industrial cleaner, kitchen helper, cleaner/housekeeper, and laundry worker. Tr. 45. The ALJ was not required to include limitations in the hypothetical that he determined to be unsupported by the evidence or not credible. *See Casey*, 987 F.2d at 1235; Campbell v. Comm'r of Soc. Sec., No. 1:09-cv-255, 2010 WL 2719839, at *7 (W.D. Mich. June 10, 2010) (affirming hypothetical that individual "should have minimum public contact and supervisor contact" adequately accounted for a moderate difficulty maintaining social functioning). Therefore, the ALJ did not err, and the VE's testimony -- given in response to a hypothetical that reasonably reflected all the limitations that the ALJ found valid and credible -- constituted substantial evidence capable of supporting the Step Five finding. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004).

Moreover, Campbell's testimony highlights the adequacy of the ALJ's findings that he could readily perform work with no close interaction with the public.  For example, he testified that he enjoyed interacting with others, such as playing Santa Claus at a charity event, hanging out with friends at both the movies and the mall, attending Alcoholics Anonymous meetings, and socializing with family.  Tr. 38, 266-68, 301, 303-05, 338-441.  These social activities demonstrate that the ALJ's hypothetical question more than accounted for Campbell's limitation in social functioning.

In sum, the ALJ adequately accounted for Campbell's moderate difficulty in social functioning by limiting him to jobs that did not require close interaction with the public.  *See, e.g., Dawson v. Barnhart*, 2006 WL 982005 at * 3 (W.D. Va. April 11, 2006) (ALJ committed no error in assessing plaintiff's mental impairments when he found that plaintiff had a "moderate difficulty in maintaining social functioning" and "[i]n order to compensate for these issues" concluded that plaintiff would "need work involving minimal contact with the public or co workers"); *Infantado v. Astrue,* 263 F. App'x 469, 477 (6th Cir. 2008) ("The hypothetical questions [the ALJ] asked of the vocational expert could have been more complete, but we do not find that they inaccurately portrayed [the] plaintiff's substantiated limitations.").  Campbell has not shown any error in the hypothetical the ALJ posed to the VE.  The ALJ's reliance on the VE's testimony was therefore proper and such testimony constitutes substantial evidence in support of the ALJ's Step Five determination.

## VII.  Conclusion

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Jesse Campbell's applications for DIB and SSI is **AFFIRMED.**

Dated: May 7, 2013

Kathleen B. Burke
United States Magistrate Judge